IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANTHONY B. QUINTANILLA,

       Plaintiff,     Case No. 3:05 CV 7203

 -vs-

                 MEMORANDUM OPINION

AK TUBE LLC.,

       Defendant.

KATZ, J.

   This matter is before the Court on Defendant AK Tube LLC's motion for summary judgment (Doc. 35), Plaintiff Anthony B. Quintanilla's ("Quintanilla") opposition (Doc. 42), and Defendant's reply (Doc. 44). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. Background**

   Quintanilla, who is of Hispanic national origin, was employed at the company now known as AK Tube from December 4, 1989 until January 5, 2004. During that time, he performed a variety of duties, working up from packaging and inspecting to his last position as production supervisor. Murray Rose ("Rose") was Vice President of AK Tube during at least a portion of Quintanilla's promotions and during his firing. In fact, Rose had participated in decisions both to promote and later to fire Quintanilla, the latter for violation of the company's "scrap tube" policy.

   AK Tube's scrap tubing policy was not reduced to an official writing, but instead was a word-of-mouth policy. Nevertheless, employees generally followed a pattern of abiding by it. Although he did not receive official training about it, Quintanilla learned of the scrap policy when

he began employment and knew about it throughout his employment. The employees were permitted to take scrap tube from the plant, but first they would need to acquire a scrap pass signed by management. The scrap was only to be taken for "personal use." For instance, selling the scrap tube would be improper.

In the fall of 2003 AK Tube conducted an investigation into unaccounted-for tubing. The investigation revealed that four employees had violated the scrap tube policy: Jon Bissonnette, a Caucasian employee, had taken prime tubing as opposed to scrap tube; Herb Harris, an African American employee, and Barry Ellis, a Caucasian supervisor, were paid for tubing that they took; and Quintanilla took tubing without a pass and gave it to a local muffler shop in exchange for automotive work on Quintanilla's automobile and those of employees whose names Quintanilla approved and provided to the muffler shop. The four individuals were fired for violating the scrap tubing policy. Rose reflected that among these violations, Plaintiff's violation was the least culpable. Rose also acknowledged that other supervisors ranked the offenses differently. Rose told Plaintiff that he should reapply to AK Tube for a lower position than supervisor after the arbitration proceedings of Bissonnette and Harris were over, and that AK Tube would rehire him.

Quintanilla also points to another employee, a Caucasian supervisor, Darren Newman ("Newman"), who allegedly took non-scrap tubing for use in his garage, to give to his cousin, and to give to a fishing buddy who let Newman use a dump truck. Rose and another supervisor searched Newman's garage to no avail. As far as Rose knew, the non-scrap tubing had been returned, because that was what management asked Newman to do.

At some point after Quintanilla was fired and after Rose was no longer employed by AK Tube, Rose had a conversation with Plaintiff's spouse, Jennifer Quintanilla ("Jennifer" or "Mrs.

2

Quintanilla"). Mrs. Quintanilla alleges that Rose indicated in that conversation that her husband was fired to balance out the number of minorities and non-minorities among the fired employees, as well as to balance out the number of Union and supervisory employees. Rose acknowledges having spoken with Jennifer about the Union-supervisor balance, but denies mentioning anything about ethnic or racial balancing.

Plaintiff filed a complaint alleging employment discrimination with the Wood County Court of Common Pleas, and the case was removed to this Court, which assumed jurisdiction on June 9, 2005. For the reasons enumerated herein, Defendant's motion for summary judgment (Doc. 35) is hereby granted.

## II. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

4

**III. Discussion**

    **A. *McDonnell Douglas* burden-shifting test for employment discrimination claims**

It is unlawful under federal law for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), set forth the order for the presentation of proof in a Title VII case, which first requires a plaintiff to establish, by a preponderance of the evidence, a prima facie case of discrimination by indirect or circumstantial evidence.

Direct evidence is found, for instance, where an employer's policy is discriminatory on its face, *see Trans World Airlines, Inc., v. Thurston*, 469 U.S. 111, 121 (1985), or where a corporate decision-maker expressly states a desire to remove employees in the protected group, *see LaPointe v. United Autoworkers Local* 600, 8 F.3d 376, 379-80 (6th Cir. 1993). In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even had it not been motivated by impermissible discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) (plurality opinion); *Manzer v. Diamond Shamrock Chemicals Co*., 29 F.3d 1078, 1081 (6th Cir. 1994).

Where no direct evidence of discrimination exists, an employee can establish her prima facie case by indirect or circumstantial evidence. In that instance, she must show (1) that she is a member of the protected class; (2) that she was denied opportunities or experienced an adverse employment decision; (3) that she was otherwise qualified; and (4) that other individuals outside

5

the protected class received more favorable treatment. *See Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (6th Cir. 1990); *Gagné v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 313 (6th Cir. 1989). Having met that burden, a presumption arises to the effect that the employer unlawfully discriminated against the plaintiff. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). The burden of production then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the less favorable treatment. *See McDonnell Douglas*, 411 U.S. at 802.

Where the defendant sets forth, through the introduction of admissible evidence, that the actions were taken for a legitimate nondiscriminatory reason, it becomes plaintiff's burden to prove by a preponderance of the evidence that the reason was actually a pretext for discrimination. To establish pretext, a plaintiff may meet their burden by showing that the adverse employment action: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6 Cir.1994). In circumstantial evidence cases, the burden of persuasion remains at all times with the employee. *Gagné*, 881 F.2d at 315-16.

It is also unlawful under Ohio law "[f]or any employer, because of the ... sex, national origin . . . [or] age . . . of any person . . . to discharge without cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev.Code § 4112.02(A). The Ohio Supreme Court has held that the coverage of § 4112.02(A) is identical to the coverage of federal law prohibiting discrimination in the employment context. Thus, evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is

necessary before a violation of § 4112.02(A) can be demonstrated. *See Genaro v. Central Transp., Inc.*, 84 Ohio St.3d 293 (Ohio 1999); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196 (1981); *see also, Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10 (1991).

### 1. Prima facie case

Here, AK Tube does not dispute the existence of a prima facie case, that (1) Quintanilla is of Hispanic national origin, (2) he was terminated from his employment at AK Tube, (3) he was otherwise qualified for the position he was holding, and (4) he was replaced by a person not in the protected class. However, AK Tube asserts that it had a legitimate, non-discriminatory reason for terminating Quintanilla's employment, namely that he violated the unwritten scrap tube policy by taking scrap tube from the workplace and giving some of it to a car mechanic in exchange for work performed on the vehicles of Quintanilla, his family members, and other AK Tube employees. AK Tube determined that this use was a violation of the "personal use" requirement of the policy, and that Quintanilla, being a supervisor, set a poor example for employees.

### 2. Pretext

Quintanilla admits violating the unwritten scrap policy, but argues that his violation was insufficient motivation to terminate his employment and that his violation did not actually motivate his termination. Quintanilla argues that his violation of the scrap tube policy was insufficient motivation for AK Tube to fire him because (1) the scrap tube policy was informal, unwritten, and did not explain the parameters of permissive "personal use" of scrap tube, and (2) he was the least culpable of the four fired employees, and he was told to expect to be rehired in another position after being fired. Quintanilla argues that his violation of the scrap tube policy did

7

not actually motivate his termination because (1) Quintanilla's wife has sworn in an affidavit that Rose told her that Quintanilla's firing was motivated by Defendant's desire to balance out its firings between two supervisors and two union employees as well as two minority employees and two white employees, and (2) a white employee, Newman, also violated the scrap policy and was not fired.

### a. Insufficient motivation

Quintanilla argues that his violation of the scrap tube policy was insufficient motivation for AK Tube to fire him because (1) the scrap tube policy was informal, unwritten, and did not explain the parameters of permissive "personal use" of scrap tube, and (2) he was the least culpable of the four fired employees, and he was told to expect to be rehired in another position with AK Tube after being fired.

"To establish pretext under the second Manzer method, the plaintiff admits the factual basis underlying the discharge and acknowledges that such conduct could motivate the dismissal, but attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir.2000) (emphasis in original) (citing *Manzer*, 29 F.3d at 1084). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. To succeed on this point, Quintanilla would have to show that, even if he did violate the scrap tube policy, it was more likely than not that Defendant terminated him because of his race. "Plaintiff however offers no evidence to prove Defendant was actually motivated by racial animus." *Thomas v. Ametech*, 464 F.Supp.2d 688, 694-95 (N.D. Ohio 2006).

8

### i. Unwritten policy

First, Quintanilla questions the legitimacy of the scrap tube policy because it was unwritten. He argues that because the policy was unwritten, it was vague, and to hold an employee to it would be too tenuous and could not itself motivate dismissal. However, Quintanilla's deposition indicates a significant and, according to both parties, accurate account of the scrap tube policy. Quintanilla Dep. at 89-94. Quintanilla understood the basic concept of "personal use" and admits violating this rule. Furthermore, the fact that the policy was unwritten does not mean that it is an unfit standard to which to hold employees. The inquiry in such cases is not about what the policy actually entailed, but whether the same action was taken by multiple similarly-situated employees with regard to the workplace policy and if they were treated differently in accordance with their membership in a protected class. *See Acred v. Motor Convoy, Inc.*, 1988 WL 147608, *4, Case No. 86-2761-TUB (W.D. Tenn. 1988) (Summary judgment is not precluded just because there is a factual dispute over what a workplace policy entailed. "The inquiry must instead focus upon whether or not plaintiff can prove a [non-protected class member] employee engaged in conduct that was . . . at least similar[] to that of plaintiff and was not terminated . . . .").

### ii. Assurances of rehiring

Next, Quintanilla points out that he was told he would be rehired if he reapplied after being fired, and that Rose considered Quintanilla to have committed the lightest violation among the discharged employees. In deposition, Rose indicated that Quintanilla was a valued and successful employee aside from the scrap incident, and that his (Rose's) intention and Quintanilla's understanding were such that Quintanilla would be asked to reapply for another position with AK

9

Tube and be rehired after his termination. Further, Rose stated that of the four employees fired after the scrap tube investigation, Quintanilla was the least culpable, and his violation was the least significant of all the fired employees'.

The fact that Rose considered Quintanilla the least culpable of the four terminated employees does not affect this Court's inquiry for at least two reasons. First, it does not appear to matter at what point above the threshold of terminable behavior a particular person is from the perspective of the employer. Fired is fired. Employers have the right to make these determinations based on several permissible factors that do not implicate an employee's national origin or other protected status.

Second, Rose admits that his opinion of Quintanilla's culpability was not universal among supervisors. Rose recalled that at least one other supervisor considered Quintanilla the third most culpable as opposed to the least (or fourth most) culpable. These are reasonable divergent views and rest in the area of discretionary employment decisions. The fact that Rose and others differed does not reasonably amount to even a suggestion of racial animus, and it does not suggest that Quintanilla's violation was not the real reason he was fired.

There is likewise no indication that, because Rose expected to rehire Quintanilla, Quintanilla's termination was not actually motivated by his violation of the scrap policy. Quintanilla's having been told that he would be rehired does not entitle him legally to have been considered above other applicants upon re-application for employment. *See Browning v. Rohm & Haas Tennessee, Inc.*, 16 F.Supp.2d 896, 904 (E.D. Tenn. 1998) (where discharged employees were told they would be given priority for rehiring, employer had no duty to rehire them). Plaintiff's "prior employment with [Defendant] is only relevant insofar as it might relate to the

10

plaintiff['s] prior work experience, and [his] status with [Defendant] was no different than that of any other member of the public." *Id.* AK Tube considered Quintanilla's prior work experience, including his violation of the scrap policy, and decided not to re-hire him into the lower position for which he applied and expected to be hired. That decision was made in the discretion of the employer and does not suggest that there was a discriminatory reason for Quintanilla's discharge.

### b. Actual motivation for termination

Quintanilla argues that his violation of the scrap tube policy did not actually motivate his termination because (1) Quintanilla's wife has sworn in an affidavit that Rose told her that Quintanilla's firing was motivated by Defendant's desire to balance out its firings between two supervisors and two union employees as well as two minority employees and two white employees, and (2) a white employee, Newman, also allegedly violated the scrap policy and was not fired.

### i. Spouse's affidavit was without notice and constitutes hearsay

Quintanilla submits, attached with his memorandum in opposition to Defendant's motion for summary judgment, a sworn affidavit from his spouse, Jennifer. In it she affirms that Rose told her that at least part of the reason Quintanilla was fired was to balance out white and minority individuals in the pool of fired employees. While the affidavit has the potential to raise factual disputes, it must be disregarded because of the concurrence of two reasons: a lack of notice, and hearsay not falling under any exceptions.[1]

### 1. Affidavit filed without notice

---

[1] While the Court need not now declare whether the lack of notice alone would constitute reason to exclude an affidavit from consideration at the summary judgment stage, its concurrence with hearsay in the instant situation renders the affidavit inadmissible for summary judgment purposes.

11

First, the affidavit was filed late and without notice, and Mrs. Quintanilla was not disclosed as a possible witness in Plaintiff's initial disclosures. Plaintiff's Rule 26(a)(1) initial disclosures, filed on July 27, 2005, identified individuals likely to have discoverable information. Doc. 11. Jennifer Quintanilla is not among them. *Id.* Jennifer Quintanilla's affidavit was taken on August 29, 2006, over a year later, and it was not submitted to the Court or served to Defendant until Plaintiff responded to Defendant's motion for summary judgment on September 8, 2006. *See Black v. Columbus Public Schools*, 124 F.Supp.2d 550, 561 (S.D.Ohio 2000) (In addition to the affidavit containing hearsay, "the Court relies on Fed.R.Civ.P. 37(c)(1) to strike the Fischer Affidavit, because Plaintiff failed to disclose Mrs. Fischer as a witness during discovery."), *rev'd on other grounds*, 79 Fed. Appx. 735 (6th Cir. 2003); *McConnell v. Swifty Transp., Inc.*, 2005 WL 1865386, *12 n.7, Case No. 2:04-CV-0153 (S.D. Ohio July 29, 2005). *See also Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1007-09 (8th Cir.1998); *Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49 (1st Cir. 2001). This rule is not merely a technical procedural rule. It is enforced for good reasons, among them that notice of possible witnesses is consistent with full and fair disclosure, and disclosure allows opposing parties the opportunity, or at least the option, to conduct its own deposition or other investigation of the potential witness's statements. Here, Defendant had no notice and thus no opportunity to depose Jennifer Quintanilla because she was not listed in Plaintiff's initial disclosures, nor was she disclosed as a potential witness in any other documents prior to Plaintiff's response to the motion for summary judgment.

### 2. Inadmissible hearsay

Second, Mrs. Quintanilla's testimony constitutes inadmissible hearsay, which this Court must exclude from consideration at the summary judgment stage. "Hearsay evidence may not be

considered on summary judgment." *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994)). Generally, hearsay evidence is an out of court statement offered for the truth of the matter asserted. Here, Plaintiff submits Jennifer Quintanilla's recollection of a statement made out of court by Rose for the substantive truth of the statement – that Quintanilla was fired to balance out minority and non-minority employees. Therefore, Jennifer Quintanilla's testimony to that effect is inadmissible hearsay.

However, an exclusion to the hearsay rule exists under Fed.R.Evid. 801(d)(2)(D) – a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *Jacklyn*, 176 F.3d at 927. The statement of an individual who was not a "supervisor" at the time the statement was made is inadmissible because the existence of the agency or employment relationship no longer exists after a supervisor loses his or her status as such. *NLRB v. Sherwood Trucking Co.*, 775 F.2d 744, 750 (6th Cir. 1985). When the conversation took place between Rose and Mrs. Quintanilla, Rose was no longer employed with AK Tube. The one-time employment relationship between Rose and AK Tube no longer existed when the conversation took place. Therefore, Mrs. Quintanilla's statements as to what Rose said are not excluded from hearsay under 801(d)(2)(D) and are inadmissible.

### ii. Other employee not similarly situated

Finally, Quintanilla argues that a similarly-situated white employee, Newman, also violated the scrap policy and was not fired. Plaintiff must produce "evidence that other parties . . .

were not fired even though they engaged in substantially identical conduct." *Manzer*, 29 F.3d at 1084.

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated in all respects. *Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987); *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own); *Cox v. Electronic Data Systems Corp.*, 751 F.Supp. 680 (E.D.Mich.1990).

*Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992). To prevail, Quintanilla must show that he and Newman were "similarly situated" and treated disparately for the same or a substantially similar violation.

Plaintiff and Newman did not engage in the same conduct – there were differentiating and mitigating circumstances which the employer determined warranted different punishments. Quintanilla's violation involved taking scrap tube without the pass that the scrap policy required and distributing the tube in exchange for auto mechanic services for him and employees who worked under him. Newman's alleged violation was different: he had the required scrap pass signed by upper management, but took the higher grade tube rather than the scrap tube to which he was entitled, and he allegedly gave it to his cousin. Management investigated, even searching Newman's garage to no avail, and Rose testified that the tube Newman took had been returned as far as Rose knew. Management considered these violations to be on different levels and to be supported by various levels of proof, also noting that Plaintiff set a bad example for the employees

with whom he colluded, while Newman acted alone. The differences between the violations support this reasonable determination by AK Tube management. Plaintiff and Newman were not "similarly situated."

**IV. Conclusion**

For the reasons enumerated herein, Defendant AK Tube's motion for summary judgment (Doc. 35) is hereby granted. Case dismissed.

IT IS SO ORDERED.

    s/ *David A. Katz*
    DAVID A. KATZ
    U. S. DISTRICT JUDGE